Charles E. HELTON, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 80–1467.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 31, 1981.
Decided June 29, 1981.

Michael J. Goldberg, Washington, D. C.,
with whom Arthur L. Fox, II, Washington,
D. C., was on the brief, for petitioner.

Kenneth B. Hipp, Deputy Asst. Gen.
Counsel, National Labor Relations Board,
Washington, D. C., of the bar of the Su-
preme Court of North Carolina, pro hac
vice, by special leave of court, with whom
Robert E. Allen, Acting Associate Gen.
Counsel, Elliott Moore, Deputy Associate
Gen. Counsel, and Christopher W. Katzen-
bach, Atty., N.L.R.B., Washington, D. C.,
were on the brief, for respondent.

Phyllis W. Curott, New York City, was on
the brief for amicus curiae Association for
Union Democracy, urging reversal.

Before ROBINSON, Chief Judge, WRIGHT, Circuit Judge, and VAN PELT,* Senior District Judge.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Circuit Judge:

Petitioner Charles Helton seeks review of a National Labor Relations Board (NLRB) decision finding that his union, Teamsters Local 515, did not commit an unfair labor practice under Section 8(b)(1)(A) of the National Labor Relations Act (the Act)[1] when it refused to allow him to post materials critical of the union on the union's bulletin board, even though it would have permitted him to post any other materials.[2] We conclude that the union may not restrict employees' rights of expression in this manner.

## I. BACKGROUND

Teamsters Local 515 represents employees at the Chattanooga, Tennessee terminal of Roadway Express, Inc. (the company). The union bulletin board was located in the employees' "breakroom" at the terminal.[3] It was maintained pursuant to the collective bargaining agreement in effect between the union and the company, which provided:

> The Employer agrees to provide suitable space for the union bulletin board in each garage, terminal or place of work. Postings by the union on such boards are to be confined to official business of the union.[4]

Although the collective bargaining agreement stated that the board was to be used only for official union business, this provision was not enforced. From at least 1967 until 1978[5] the union had permitted employees and nonemployees to post a wide variety of notices. Items posted on the board included for-sale notices, announcements of church revivals, nonunion political campaign materials, and even *Playboy* centerfolds.[6]

Two other bulletin boards were also located in the employees' breakroom. The company kept its own bulletin board, which was glass-covered and locked, and which was used for posting work rules and safety notices. Occasionally, the company would also allow the union to place notices there. The

---

* Of the United States District Court for the District of Nebraska, sitting by designation pursuant to 28 U.S.C. § 294(d) (1976).

1. Section 8(b)(1)(A) of the National Labor Relations Act, 29 U.S.C. § 158(b)(1)(A) (1976), provides:

   It shall be an unfair labor practice for a labor organization or its agents—
   (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section [7] * * * : *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein[.]

   Section 7 of the NLRA, 29 U.S.C. § 157 (1976), provides:

   Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment * * *.

2. *See Teamsters Local 515,* 248 NLRB 83 (1980) (NLRB Decision), *reprinted at* Appendix (App.) 10. Charles Helton was the charging party in the NLRB proceeding. The General Counsel of the NLRB prosecuted the charge below and now defends the NLRB's ruling. Teamsters Local 515 was respondent below. It is not participating in this appeal. The Association for Union Democracy and the American Civil Liberties Union have submitted briefs *amici curiae.*

3. *See Teamsters Local 515,* Decision of Administrative Law Judge (ALJ Decision), *reprinted at* App. 1–8.

4. *Id. (quoting* Art. 19, § 2 of collective bargaining agreement).

5. *Id.* at App. 5.

6. *Id.* at App. 2. Both employees and nonemployees used the union bulletin board. As the ALJ states, "In short, it is admitted that there were no restrictions on the use of this bulletin board by either Roadway or the Union * * *." *Id.*

third board, which was relatively small, was an all-purpose board used primarily to post notices regarding the employees' sick fund. This board was commonly referred to as the "sick fund board."[7]

In late 1978 petitioner Helton, who was a company employee and a union member, joined the Professional Drivers' Council (PROD). PROD is an organization of rank-and-file Teamsters that promotes truck safety and seeks to expose union corruption and pension fund abuse.[8]  Shortly after he became a member Helton received some literature from PROD, including a copy of a newspaper article describing Internal Revenue Service charges against a Las Vegas gambler to whom the Teamsters' pension fund had loaned large sums of money and a PROD editorial critical of the Teamsters' pension fund management.[9]

On December 14, 1978 Helton posted the newspaper article and the PROD editorial on the union bulletin board.  Later that day the union's job steward, acting pursuant to instructions of the union's business agent, removed this literature.[10]  When Helton asked the business agent why the materials had been removed, the agent stated that "being a union official he had the legal right to add to or delete from that board, whatever he saw fit."[11]  Several weeks later, on January 8, 1979, Helton posted new PROD material on the union board.  This literature was also critical of the Teamsters and accused several union officials of improper and illegal conduct.  Again, the job steward removed the literature.[12]  The un-

ion did not take any other action against Helton, however.[13]

Shortly after these incidents occurred the union board, the company board, and the sick fund board were removed from the breakroom so that the walls could be painted.  When the painting was completed only the company board and the union board were returned.  Both were placed under locked glass.[14]  Thereafter Helton asked union officials for permission to post PROD literature on the union bulletin board.  They refused to grant permission.  However, they continued to allow employees to use the union bulletin board for nonunion business and for personal notices.[15]

Petitioner filed unfair labor practice charges against Teamsters Local 515 with the NLRB on February 6, 1979.  The General Counsel issued a complaint, and a hearing was held before an Administrative Law Judge (ALJ) in June 1979.[16]  At the hearing the union's business agent testified that he had removed the PROD material from the bulletin board because:

> It was derogatory, it was adverse toward our local union and the Teamsters in general.  And, I felt it shouldn't be there because it created controversy among the members . . .  I felt it should not go on the board. . . .[17]

In his decision the ALJ ruled that the union had committed an unfair labor practice under Section 8(b)(1)(A), which makes it an unfair labor practice for a union to "restrain or coerce * * * employees" in the exercise of their rights under Section 7 of

7.  *Id.*

8.  *Id.* at App. 3.  Helton testified that "his understanding of the purpose of PROD was to reform the Teamsters by bringing to the members['] attention corruption within the union and to disseminate information concerning governmental agencies which could assist in solving various problems." *Id.*

9.  *Id.  See also* General Counsel Exhibit 2, *reprinted at* App. 61 (copy of newspaper article and PROD editorial).

10.  ALJ Decision at App. 3.

11.  *Id.*

12.  *Id.  See also* General Counsel Exhibit 3, *reprinted at* App. 61 (copy of PROD literature posted on Jan. 8, 1979).

13.  *See* NLRB Decision, 248 NLRB at 83, App. 13.

14.  *See* ALJ Decision at App. 3 n.2.

15.  *Id.*

16.  *Id.* at App. 1.

17.  *Id.* at App. 4 (ellipses in original).

the Act.[18] He began by stating that Helton's activities were clearly encompassed by Section 7.[19] He then observed that according to well settled precedent an employer would commit an unfair labor practice under Section 8(a)(1) if it prevented its employees from posting union literature on company bulletin boards but allowed them to post other noncompany materials.[20] The ALJ reasoned that unions should be held to the same standard of conduct with respect to their own bulletin boards.[21] In reaching this conclusion the ALJ found that the availability of alternative means of communication, for example, leaving the material on tables in the breakroom, was immaterial. He further found that there was no danger that employees would mistake PROD literature for official union literature and that, although the PROD literature was extremely critical of the union, it was not so offensive that it did not deserve protection. Finally, the ALJ rejected as "mere conjecture" the business agent's contention that the literature might lead to altercations among employees.[22]

The union filed exceptions to the ALJ's decision in September 1979. A three-member panel of the NLRB reversed by a vote of 2–1. The majority did not overturn any of the ALJ's findings of fact. It also conceded that Helton's activities were encompassed by Section 7. It ruled, however, that unions should not be held to the same standard of conduct as employers.[23] Section 8(a)(1) makes it an unfair labor practice for an employer "to *interfere with,* restrain, or coerce employees in the exercise of the rights guaranteed in section [7]" (emphasis added).[24] Section 8(b)(1)(A), on the other hand, only makes it an unfair labor practice for a labor organization or its agents "to restrain or coerce" employees in the exercise of the rights guaranteed by Section 7.[25] According to the majority, there was no restraint or coercion here; the union did not discipline or threaten Helton, and its actions were "completely devoid of any implications of retribution * * *."[26] The majority also noted that "Helton had ready access to other, equally effective, means of distribution."[27]

18. 29 U.S.C. § 158(b)(1)(A) (1976). *See also* note 1 *supra (quoting* §§ 8(b)(1)(A) and 7).

19. ALJ Decision at App. 5 (*citing Roadway Express, Inc.,* 239 NLRB 653 (1978); *Transcon Lines,* 235 NLRB 1163 (1978), *enforced,* 589 F.2d 232 (5th Cir. 1979)). Teamsters Local 515 apparently conceded that Helton's activities were protected by § 7. *Id.*

20. The ALJ observed that an employer could not discriminatorily apply an otherwise valid no-solicitation rule solely to prevent distribution of union materials. *Id.* He then cited *Vincent's Steak House,* 216 NLRB 647 (1975), in which the NLRB expressly held that an employer could not prevent its employees from posting union literature on company bulletin boards when it allowed them to post other noncompany materials. *See* note 32 *infra.*

21. ALJ Decision at App. 5. The ALJ went on to state that if the union had enforced the provision in the contract restricting use of the bulletin board to official union business, there would have been no unfair labor practice. We do not approve or disapprove this conclusion here. It is possible that such contractual provisions violate the union's duty of fair representation. *See* note 73 *infra.*

22. ALJ Decision at App. 5–6.

23. *See* NLRB Decision, 248 NLRB at 83, App. 12. Chairman Fanning and Member Penello formed the majority. Member Jenkins dissented.

24. Section 8(a)(1), 29 U.S.C. § 158(a)(1) (1976), provides:

It shall be an unfair labor practice for an employer—
    (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7.]

25. 29 U.S.C. § 158(b)(1)(A) (1976). *See* note 1 *supra (quoting* text of § 8(b)(1)(A)).

26. NLRB Decision, 248 NLRB at 83, App. 13.

27. *Id.* The NLRB noted: "The record is clear that PROD literature is distributed in the breakroom without any action being taken by either the Employer or the Respondent, and Helton could also have posted the material on the all-purpose bulletin board." *Id.,* 248 NLRB at 83 n.3, App. 13 n.3. The ALJ never expressly found that alternative means of communication existed. Helton now disputes the factual accuracy of the NLRB's claim. *See* petitioner's brief at 12–13 n.7; text and note at note 49 *infra.*

The dissenting member of the panel would have found a violation of Section 8(b)(1)(A). He argued that "it is difficult to conceive of a greater restraint or coercive impact on Section 7 rights than that which suppresses freedom of expression concerning matters inherent in that section."[28] The absence of a threat of reprisal did not "legitimize the action."[29] He agreed with the ALJ that the availability of alternate channels of communication was immaterial.[30]

## II. THE NLRB'S INTERPRETATION OF SECTION 8(b)(1)(A)

As we have seen, the NLRB concedes that Helton's activities on behalf of PROD are encompassed by Section 7 of the Act.[31] It further concedes that under Section 8(a)(1) an employer may not prohibit employees from posting union materials on its bulletin board when it allows them access to the board for other purposes.[32] The NLRB reasons, however, that Section 8(b)(1)(A) is far more narrow than Section 8(a)(1); it only proscribes union conduct that involves threats of violence, economic reprisal, or discipline. To support this position it points out that Section 8(b)(1)(A) does not contain the words "interfere with."

■ We find that Section 8(b)(1)(A)'s prohibition against restraint or coercion does apply to the union conduct at issue here; its range of application is not limited to union conduct involving threats of violence or economic coercion.[33] The NLRB's narrow interpretation is inconsistent with

---

**28.** NLRB Decision, 248 NLRB at 84, App. 16 (Member Jenkins, dissenting).

**29.** *Id.* In his dissent Member Jenkins relied heavily on the Supreme Court's decision in *NLRB v. Magnavox Co.*, 415 U.S. 332, 94 S.Ct. 1099, 39 L.Ed.2d 358 (1974). In that case a union challenged an employer's rule against distribution of literature on company property. This rule was presumptively invalid. However, the collective bargaining agreement in effect between the union and the employer provided that the employer could issue rules governing use of plant property; it also provided that there would be bulletin boards for union notices. Thus the Court was confronted with the question whether the union had waived the employees' § 7 rights by agreeing to an otherwise invalid no-distribution rule in return for the use of a union bulletin board. The Court held that the union could not waive the individual employees' § 7 rights. The bulletin boards were not an adequate substitute since they were to be used only for union notices and thus would not give a union's adversaries an opportunity to communicate with their fellow employees.

Member Jenkins suggests that *Magnavox* effectively holds that a union may not restrict the employees' right to disseminate views critical of the union. The majority distinguished *Magnavox* on several grounds. First, this case, unlike *Magnavox*, involved § 8(b)(1)(A) rather than § 8(a)(1). Second, there was no contractual waiver of individual employees' § 7 rights. Third, union policing of a union bulletin board is not equivalent to "the blanket denial to adversaries of 'equal access to and communications with their fellow employees.'" NLRB Decision, 248 NLRB at 83 n.2, App. 12 n.2 (*quoting NLRB v. Magnavox Co., supra*, 415 U.S. at 326, 94 S.Ct. at 1102).

**30.** NLRB Decision, 248 NLRB at 84, App. 15 (Member Jenkins, dissenting).

**31.** *See Roadway Express, Inc., supra* note 19 (ruling that PROD membership and literature are protected by § 7 of the Act); *Transcon Lines, supra* note 19 (same); *cf. Nu-Car Carriers, Inc.*, 88 NLRB 75 (1950), *enforced*, 189 F.2d 756 (3d Cir.), *cert. denied*, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1951) (employee criticism of bargaining position adopted by union is protected by § 7).

**32.** *See Vincent's Steak House, supra* note 20 (employer may not discriminate against union regarding use of bulletin board); *see also Sterling Machine & Engineering, Inc.*, 247 NLRB No. 77 (1980); *Container Corp. of America*, 244 NLRB No. 53 (1979); *Liberty Nursing Homes, Inc.*, 236 NLRB 456 (1978). *See generally Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 462 (1945) (no-solicitation rule that discriminates against union is not valid).

**33.** We do not hold, however, that § 8(b)(1)(A) is precisely analogous to § 8(a)(1). As we explain in Part III *infra*, the former differs from the latter in one essential respect: it contains a proviso which states that a union may prescribe rules "with respect to the acquisition or retention of membership[.]" 29 U.S.C. § 158(b)(1)(A) (1976). By including this proviso Congress recognized that the relationship between the union and the employee is not identical with that between the employer and the employee, and that the union has an interest in controlling its membership. We conclude that this proviso does not exempt the conduct at issue here.

the plain meaning of the statute and with the legislative history, is not supported by Supreme Court decisions or the NLRB's own precedent, and is fraught with practical difficulties.

### A. The Statutory Language and the Legislative History

As a preliminary matter, the meaning of a statute should be sought in the language in which it is framed. See Local 1976, United Brhd of Carpenters & Joiners v. NLRB, 357 U.S. 93, 100, 78 S.Ct. 1011, 1016, 2 L.Ed.2d 1186 (1958); see also Southeastern Community College v. Davis, 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1976); Internat'l Brhd of Teamsters v. Daniel, 439 U.S. 551, 566 n.20, 99 S.Ct. 790, 800 n.20, 58 L.Ed.2d 808 (1979); Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917). The action taken by the union here certainly falls within the plain meaning of Section 8(b)(1)(A). When the union removed Helton's literature from the bulletin board, it "restrained" him in the exercise of his Section 7 rights, at least as the word "restraint" is commonly understood.[34]

As the NLRB emphasizes, however, interpretation of Section 8(b)(1)(A) cannot be governed solely by reliance on the statutory language. The Taft-Hartley Act, which added Section 8(b)(1)(A) to the National Labor Relations Act, was "the result of conflict and compromise between strong contending forces and deeply held views on the role of organized labor in the free economic life of the Nation and the appropri-ate balance to be struck between the uncontrolled power of management and labor to further their respective interests." Local 1976, United Brhd of Carpenters & Joiners v. NLRB, supra, 357 U.S. at 99–100, 78 S.Ct. at 1016.[35] Thus the Supreme Court has stated that interpretations of Section 8(b)(1)(A) must be guided not just by the section's literal language, but also by an understanding of the congressional purpose. NLRB v. Allis-Chalmers Manufacturing Co., 388 U.S. 175, 179, 87 S.Ct. 2001, 2005–06, 18 L.Ed.2d 1123 (1967); NLRB v. Drivers, Chauffeurs, Helpers, Local Union No. 639, 362 U.S. 274, 292, 80 S.Ct. 706, 716, 4 L.Ed.2d 710 (1960).[36] Our review of the legislative history fails to convince us that Congress intended Section 8(b)(1)(A) to apply solely to union conduct involving threats of violence, economic reprisal, or discipline.

The sponsors of the Taft-Hartley Act, in explaining their proposed legislation, focused primarily on the need to control union violence and economic coercion. For example, Senator Taft, in responding to a request for examples of the sort of conduct that Section 8(b)(1)(A) would prohibit, described threats of bodily harm, mass picketing in organization campaigns, and coercion that prevented employees not involved in a labor dispute from going to work. 93 Cong. Rec. 4435–4436 (1947), 2 Legislative History of the Labor Management Relations Act, 1947 (Leg.Hist.) 1205–1206 (1948). See also 93 Cong.Rec. 4016–4017, 4271, 4432, 4434, 2 Leg.Hist. 1018–1021, 1139, 1199, 1203 (remarks of Senator Ball). However, nothing

---

**34.** N. Webster, Third New International Dictionary 1936 (unabridged ed. 1961), states that to "restrain" means, inter alia, "to hold (as a person) back from some action, procedure, or course * * *." As Helton points out in his brief, petitioner's brief at 14, actions that limit First Amendment rights are commonly referred to as "restraints." See, e. g., Madison School District v. Wisconsin Employment Relations Comm'n, 429 U.S. 167, 177, 97 S.Ct. 421, 427, 50 L.Ed.2d 376 (1976); Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 553, 95 S.Ct. 1239, 1243–44, 43 L.Ed.2d 448 (1975).

**35.** The Taft-Hartley Act added § 8(b)(1)(A) to the National Labor Relations Act in 1947. Be-fore that time there was no unfair labor practice provision for unions.

**36.** Of course, it is "a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." Church of the Holy Trinity v. United States, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892). These cases merely emphasize that this principle is particularly important in interpreting labor legislation. See also Nat'l Woodwork Manufacturers Ass'n v. NLRB, 386 U.S. 612, 619–620, 87 S.Ct. 1250, 1254–1255, 18 L.Ed.2d 357 (1967) (making same point with respect to § 8(e), 29 U.S.C. § 158(e) (1976)).

in the legislative history supports the conclusion that violence and economic reprisal were the sole evils at which Section 8(b)(1)(A) was aimed. Rather, it appears that Congress intended Section 8(b)(1)(A) to cover a range of conduct as broad as that covered by Section 8(a)(1). Senator Ball, a co-sponsor of the legislation, stated that "the purpose of the amendment is very simple. It is to insert an unfair-labor practice for unions *identical* with the first unfair labor practice prohibited to employers in the present act * * *." 93 Cong.Rec. 4016 (1947), 2 Leg.Hist. 1018 (emphasis added). *See also* 93 Cong.Rec. 4021, 4023, 4025, 4436 (1947), 2 Leg.Hist. 1028, 1031, 1032, 1207; S.Rep.No.105, 80th Cong., 1st Sess. 50, 1 Leg.Hist. 456.

Omission of the words "interfere with" from Section 8(b)(1)(A) was not intended to indicate that union conduct should be measured against a less demanding standard than employer conduct. The legislation as originally proposed contained these words. They were deleted because it was feared that they would unduly restrict union organization campaigns; they might be "construed to mean that any conversation, any persuasion, any urging on the part of any person, in an effort to persuade another to join a labor organization, would constitute an unfair labor practice." 93 Cong.Rec. 4399 (1947), 2 Leg.Hist. 1138 (remarks of Senator Ives). Senator Taft agreed to the deletion because he was convinced it would have no effect on the application of Section 8(b)(1)(A):

> I have consulted with the attorneys and they tell me that elimination of the words "interfere with" would not, so far as they know, have any effect on the court decisions. Eliminating those words would not make any substantial change in the meaning. * * *

*Id.* (remarks of Senator Taft). Similarly, Senator Ball stated that "the words 'interfere with' are very vague," that even with respect to employers "no complaint is ever issued on the interference angle," and that, because union organizational activities might be affected, it is "important that such vague language be eliminated * * *." 93 Cong.Rec. 4399 (1947), 2 Leg.Hist. 1139 (remarks of Senator Ball).

### B. *Supreme Court Decisions Interpreting Section 8(b)(1)(A)*

The NLRB argues that the Supreme Court decisions interpreting Section 8(b)(1)(A), which rely in part on the legislative history, support the position it has adopted here. We disagree. These decisions do not hold that Section 8(b)(1)(A) only proscribes union conduct involving threats of violence, intimidation, or economic reprisal.

The NLRB relies heavily on the Supreme Court's decision in *NLRB v. Drivers, Chauffeurs, Helpers, Local Union No. 639, supra.* In that case the Court held that peaceful recognitional picketing by a labor union did not restrain or coerce employees within the meaning of Section 8(b)(1)(A). The NLRB points out that in reaching this conclusion the Court reviewed the legislative history of the Taft-Hartley Act and concluded that the chief evil at which Section 8(b)(1)(A) was aimed was "the elimination of the use of repressive tactics bordering on violence or involving particularized threats of economic reprisal." 362 U.S. at 287, 80 S.Ct. at 714. The Court then emphasized the peaceful nature of the picketing in question. The NLRB suggests that by adopting this line of reasoning the Supreme Court endorsed a narrow interpretation of Section 8(b)(1)(A). However, the Court never expressly held that the sole purpose of Section 8(b)(1)(A) was to prevent union violence [37];

---

37. As the NLRB emphasizes, the Court does state that § 8(b)(1)(A) "is a grant of power to the Board limited to authority to proceed against union tactics involving violence, intimidation, and reprisal or threats thereof * * *." *NLRB v. Drivers, Chauffeurs, Helpers, Local Union No. 639*, 362 U.S. 274, 290, 80 S.Ct. 706, 715, 4 L.Ed.2d 710 (1960). It goes on to state, however, that § 8(b)(1)(A) requires "conduct involving more than the general pressures upon persons employed by the affected employers implicit in general economic strikes." *Id.* In other words, it leaves open the possibility that conduct lying somewhere between violence and peaceful recognitional picketing may be covered by the Act.

in particular, it never suggested that Section 8(b)(1)(A) might not apply to union conduct lying somewhere between threats of violence and simple peaceful persuasion. In fact, the Supreme Court decided to uphold peaceful recognitional picketing primarily because provisions in the House version of the bill that would have explicitly prohibited such picketing were deleted in conference. The Court also relied on statements in the Senate debates clearly indicating that the bill's sponsors did not intend it to apply to peaceful methods of persuasion. 362 U.S. at 287–289, 80 S.Ct. at 713–715.[38]

Although *Drivers Local 639* might be read as containing some support for the NLRB's narrow interpretation of Section 8(b)(1)(A), a subsequent decision significantly undercut that support. In *Internat'l Ladies' Garment Wkrs Union v. NLRB*, 366 U.S. 731, 738, 81 S.Ct. 1603, 1607–08, 6 L.Ed.2d 762 (1961), the Supreme Court stated:

> In the Taft-Hartley law, Congress added § 8(b)(1)(A) to the [National Labor Relations] Act, prohibiting, as the Court of Appeals held, "unions from invading the rights of employees under § 7 in a fashion comparable to the activities of employers

prohibited under § 8(a)(1)." * * * It was the intent of Congress to impose upon unions *the same* restrictions which the [National Labor Relations] Act imposed on employers with respect to violations of employee rights.

(Emphasis added; citation and footnote omitted.) The Court then held that, just as an employer violates Section 8(a)(1) by granting exclusive bargaining representative status to a union that does not have majority support, so also a union violates Section 8(b)(1)(A) by accepting such status.[39]

The NLRB also relies on the Supreme Court's decision in *NLRB v. Allis-Chalmers Manufacturing Co., supra*, 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123. In that case the Court held that a union did not violate Section 8(b)(1)(A) when it fined its members for violating union membership rules. As the NLRB correctly points out, this union conduct would seem to fall within the literal meaning of the terms "restrain" or "coerce." However, the Court did not approve the union fines because it believed that the words "restrain or coerce" should be given a narrow interpretation.[40] Rather,

---

**38.** The Court further observed that in the Labor-Management Reporting and Disclosure Act of 1959 Congress legislated a comprehensive code governing organizational strikes and picketing. Although this statute proscribes peaceful strikes in some circumstances, it also prevents the NLRB from interfering with legitimate picketing activity. *See* 29 U.S.C. § 158(b)(7)(C) (1976). The Court observed that if it were to interpret § 8(b)(1)(A) as applying to peaceful picketing it would interfere with this legislative scheme. *Id.* at 291, 80 S.Ct. at 716.

**39.** The NLRB seeks to distinguish *Internat'l Ladies' Garment Wkrs Union v. NLRB*, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961), on the ground that when an employer and a union enter into an agreement under which the employer recognizes the union as exclusive bargaining representative even though a majority of the employees do not support the union, they have engaged in "the very sort of direct economic coercion which Congress intended to prohibit." Respondent's brief at 16 n.8. We fail to understand how such agreements constitute economic coercion. The employees' jobs are not threatened in the same way that they are threatened by strikes or picketing. Nor do

the employees face any other economic penalty. Certainly the Court's opinion does not characterize the agreement as economic coercion.

**40.** The NLRB emphasizes that in *Allis-Chalmers* the Court again reviewed the legislative history of the Taft-Hartley Act and noted that the chief evil at which it was aimed was union conduct involving threats of violence and economic reprisal. *See NLRB v. Allis-Chalmers Manufacturing Co.*, 388 U.S. 175, 184–190, 87 S.Ct. 2001, 2008–2012, 18 L.Ed.2d 1123 (1967). It did not hold, however, that § 8(b)(1)(A) would apply solely to such conduct. In fact, it also noted those portions of the legislative history suggesting that Congress intended the scope of § 8(b)(1)(A) to be as broad as the scope of § 8(a)(1). The Court referred to the legislative history primarily because it wished to demonstrate the absence of any intention to regulate the internal affairs of unions.

Other Supreme Court decisions have also suggested that § 8(b)(1)(A) is aimed primarily at violence or economic reprisal. Again, however, they do not hold that these are the only evils at which the provision is aimed. *See NLRB v. Boeing Co.*, 412 U.S. 67, 78 n.15, 93

the Court decided to protect the union's conduct because it concluded that Congress had not intended to regulate internal union affairs. It noted that Section 8(b)(1)(A) contains an internal union affairs proviso, which states that the section "shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership[.]"[41] The NLRB did not rely on this proviso in reaching its decision here. In any event, as we explain in Part III *infra*, we do not believe that the proviso protects the union's conduct.

## C. *NLRB Precedent*

The NLRB further argues that it has consistently held that Section 8(b)(1)(A) applies only to union conduct involving threats of violence, economic coercion, or discipline. If this were true, deference to the agency interpretation might be appropriate. An administrative agency's consistent, longstanding interpretation of the statute under which it operates is entitled to

considerable weight.[42] *Internat'l Brhd of Teamsters v. Daniel, supra,* 439 U.S. at 566 n.20, 99 S.Ct. at 800 n.20; *United States v. Nat'l Ass'n of Securities Dealers,* 422 U.S. 694, 719, 95 S.Ct. 2427, 2442–43, 45 L.Ed.2d 486 (1975); *Saxbe v. Bustos,* 419 U.S. 65, 74, 95 S.Ct. 272, 279, 42 L.Ed.2d 231 (1974); *Investment Company Institute v. Camp,* 401 U.S. 617, 626–627, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Even in its own decisions, however, the NLRB has not relied on a narrow interpretation of Section 8(b)(1)(A); the NLRB has never before held that the section applies only to threats of violence, economic reprisal, or discipline.[43]

The NLRB has pointed out that the central focus of the congressional debate over the Taft-Hartley Act was on union tactics involving physical violence and economic coercion. *See Nat'l Maritime Union,* 78 NLRB 971, 982–987, *enforced,* 175 F.2d 686 (2d Cir.), *cert. denied,* 338 U.S. 954, 70 S.Ct. 492, 94 L.Ed. 589 (1949).[44] More-

S.Ct. 1952, 1958–59 n.15, 36 L.Ed.2d 752 (1973); *Scofield v. NLRB,* 394 U.S. 423, 428 n.4, 89 S.Ct. 1154, 1157 n.4, 22 L.Ed.2d 385 (1969). Both *Scofield* and *Boeing,* like *Allis-Chalmers,* involve the scope of the NLRB's authority to regulate internal union affairs.

**41.** 29 U.S.C. § 158(b)(1)(A) (1976).

**42.** On the other hand, this deference is constrained by the "obligation to honor the clear meaning of a statute, as revealed by its language, purpose, and history." *Internat'l Brhd of Teamsters v. Daniel,* 439 U.S. 551, 566 n.20, 99 S.Ct. 790, 800 n.20, 58 L.Ed.2d 808 (1979). The language and history of § 8(b)(1)(A) do not support the NLRB's interpretation. Thus, even if the NLRB had consistently employed a narrow reading of the statute, we might have been unable to endorse that reading. *See SEC v. Sloan,* 436 U.S. 103, 117–119, 98 S.Ct. 1702, 1711–1712, 56 L.Ed.2d 148 (1978) (rejecting Securities & Exchange Commission's interpretation of Securities Act).

**43.** We think it worthwhile to note that agencies have an obligation to be consistent in their adjudicative decisions. *See, e. g., Sunbeam Television Corp. v. FCC,* 243 F.2d 26 (D.C.Cir. 1957). This is not to say that they may never adjust previous rules of decision. *See, e. g., Leedom v. Internat'l Brhd of Elec. Wkrs,* 278 F.2d 237 (D.C.Cir.1960). At the very least, however, they must explain departures from

past practice. *See, e. g., Contractors Transport Corp. v. United States,* 537 F.2d 1160 (4th Cir. 1976); *Brennan v. Gilles & Cotting, Inc.,* 504 F.2d 1255 (4th Cir. 1974). By employing a narrow interpretation of § 8(b)(1)(A) in this case, the NLRB may not have fulfilled the requirement of consistency.

**44.** In *Nat'l Maritime Union,* 78 NLRB 971, 982–987 (1948), *enforced,* 175 F.2d 686 (2d Cir.), *cert. denied,* 338 U.S. 954, 70 S.Ct. 492, 94 L.Ed.2d 589 (1949), the Board held that a union did not violate § 8(b)(1)(A) when it called a strike against employers who would not agree to a contract provision that would have required them to use a union hiring hall. The NLRB reviewed the legislative history and concluded that "Congress was interested in eliminating physical violence and intimidation by unions or their representatives, as well as the use by unions of threats of economic action against specific individuals in an effort to compel them to join." 78 NLRB at 985. The NLRB then reasoned that Congress did not intend § 8(b)(1)(A) to be considered violated any time union conduct interfered with protected rights under § 7. *Id.* at 985–986. But *Nat'l Maritime Union* does not hold that § 8(b)(1)(A) applies only to union conduct involving threats of violence or economic reprisal. Indeed, the decision also notes that portion of the legislative history which states that "[t]he purpose of the

over, it has consistently held that union violence and intimidation violates Section 8(b)(1)(A). *See, e. g., NLRB v. Union Nacional de Trabajadores,* 540 F.2d 1 (1st Cir.), *cert. denied,* 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1976) (enforcing NLRB order); *Nat'l Cash Register Co. v. NLRB,* 405 F.2d 497 (6th Cir. 1972) (same). And the Board has held that economic coercion is unacceptable under Section 8(b)(1)(A). *See, e. g., Teamsters Local 1040,* 174 NLRB 1153 (1969).[45] However, the NLRB has also found Section 8(b)(1)(A) violations in situations where the union had not threatened discipline or other retribution.

For example, in *Internat'l Union of Elec., Radio & Machine Wkrs, Local 601,* 180 NLRB 1062 (1970), an employee sought to exercise his Section 7 right to refuse to authorize a payroll dues deduction and to tender his dues by personal check instead. The union refused to accept his checks. The ALJ found that the union had violated Section 8(b)(1)(A) in part because he believed the union's conduct constituted an implied threat to the employee's job. In adopting the ALJ's proposed order the NLRB rejected this finding of an implied threat, stating "we do not find it necessary to rely on any surrounding threatening circumstances." *Id.* at 1062. The simple fact that the union had prevented the employee from exercising his Section 7 right to refuse to allow a payroll deduction was sufficient to support a finding of an unfair labor practice. *Id.*[46] Similarly, in *General Motors Corp.,* 168 NLRB 1723 (1966), and *General Motors Corp.,* 147 NLRB 509 (1964), the NLRB held that a union violated Section 8(b)(1)(A) when it agreed to contractual provisions banning distribution of rival unions' literature during nonworktimes and in nonworking areas. The union's conduct in these cases, which presented an issue closely related to the issue we confront here, clearly did not involve threats of economic coercion.[47]

### D. Practical Difficulties With NLRB Interpretation

We also believe that the NLRB's interpretation of Section 8(b)(1)(A) poses substantial practical problems. The NLRB, the unions, and the courts would be required to distinguish between conduct that restrains or coerces employees in the exercise of their Section 7 rights, but does not involve threats of violence or economic reprisal, and conduct that restrains or coerces employees and also involves threats of violence or eco-

amendment is simply to provide that where unions * * * indulge in practices which, if an employer indulged in them, would be unfair labor practices, such as making threats or false promises or false statements, the union also shall be guilty of unfair labor practices." *Id.* at 983 (*quoting* 93 Cong.Rec. 4016 (1947), 2 Leg. Hist. 1058 (statement of Sen. Ball)).

**45.** In *Teamsters Local 1040,* 174 NLRB 1153 (1969), the Board held that a union violates § 8(b)(1)(A) when it forbids its members to engage in strike-breaking by threatening job-related sanctions, such as blacklisting with future employers.

**46.** The NLRB stated:
The significant factor in this situation is that the only way in which an employee was permitted to comply with his obligation to remain a union member in good standing under a lawful union-security clause was to execute a dues checkoff authorization card. Such an obligation deprives the employee of his right to select or reject the checkoff system as the method by which to pay his periodic dues to the Union. The Board has repeatedly held that dues checkoff authorizations must be made [ ]voluntarily,[ ] and that an employee has [ ]a right under Section 7 of the Act to refuse to sign checkoff authorization cards.[ ] Any conduct, express or implied, which coerces an employee in his attempt to exercise this right clearly violates Section 8(b)(1)(A).

*Internat'l Union of Elec., Radio & Machine Wkrs, Local 601,* 180 NLRB 1062 (1970) (footnotes omitted).

**47.** The NLRB argues that these cases do involve economic coercion. "In waiving employee distribution rights in the contracts in those cases, the unions used the inherently coercive powers of the employer to prevent employee distribution of literature adverse to the unions * * *." Respondent's brief at 11. We find this contention unpersuasive. The union does not engage in economic coercion simply because it joins forces with the employer. Economic coercion, as we understand it, involves conduct that threatens employees with loss of their jobs or with some other pecuniary sanction. No such conduct occurred in the *General Motors* cases.

nomic reprisal. This line-drawing exercise, which would be unnecessary if the plain meaning of the statute controlled, would require resolution of difficult issues of fact.[48]

The facts of this case help illustrate the potential difficulties. The NLRB, which emphasized that no disciplinary action was ever taken against Helton, apparently believes that the union's conduct cannot be viewed as intimidation.[49] It might be argued, however, that the union's conduct carried an implicit threat, namely, that Helton would be punished if he continued his activities on behalf of PROD. Although this question was apparently not explored at the hearing before the ALJ, it is quite possible that Helton was intimidated by the union's action. Thus, under the NLRB's interpretation of Section 8(b)(1)(A), proper resolution of this case might require determining whether Helton felt threatened, whether his fears were reasonable, and whether the union intended to threaten Helton.[50] All of these questions would be avoided if the statute is interpreted to prohibit any action that restrains an employee in the exercise of his Section 7 rights.

## III. RELEVANCE OF INTERNAL UNION AFFAIRS PROVISO

■ Section 8(b)(1)(A) is different from Section 8(a)(1) in one essential respect. As we noted in our discussion of *Allis-Chalmers, supra*, Section 8(b)(1)(A) contains an internal union affairs proviso which states that a union does not commit an unfair labor practice when it prescribes "its own rules with respect to the acquisition or retention of membership[.]"[51] This proviso extends some protection to union conduct that would otherwise fall within the prohibition against restraint or coercion of employees in the exercise of their Section 7 rights. We conclude, however, that it does not insulate the conduct at issue here.[52]

In adopting the internal union affairs proviso Congress recognized that unions have an interest in preserving and strengthening their positions as collective bargaining agents. It further recognized that they cannot serve this interest unless they have some freedom to discipline members who violate rules and regulations governing membership.[53] However, union power cannot be absolute. The desire to minimize intrusion upon internal union affairs must be balanced against the need to protect employees who wish to assert their independence from the union, as well as against any other public policies embodied in the federal labor laws.[54]

In *Scofield v. NLRB*, 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969), the Su-

**48.** We do not mean to imply that all § 8(b)(1)(A) cases would be easy if the ordinary meaning of the words "restrain or coerce" controlled. *See NLRB v. Allis-Chalmers Manufacturing Co., supra* note 40, 388 U.S. at 179, 87 S.Ct. at 2005–2006 (referring to "inherent imprecision" of words "restrain or coerce"). We merely wish to point out that the NLRB's interpretation compounds the difficulties of application.

**49.** The NLRB does not seem to have considered the possibility that the union's action might be viewed as an implicit threat, and thus fit within its interpretation of § 8(b)(1)(A).

**50.** If the NLRB were willing to concede that implicit threats were prohibited under § 8(b)(1)(A), then it might also be forced to confront the question whether it is enough that an employee is actually frightened, or whether the employee's fears must be reasonable, that is, whether an objective or a subjective test controls.

**51.** 29 U.S.C. § 158(b)(1)(A) (1976).

**52.** Although the internal union affairs proviso is discussed in the briefs on appeal, the NLRB did not rely on the proviso in its decision. Thus, even if it did protect the conduct at issue here, we could not affirm on this basis. *See SEC v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). We discuss the proviso here to demonstrate that the union conduct cannot be justified on any grounds.

**53.** *See NLRB v. Allis-Chalmers Manufacturing Co., supra*, note 40, 388 U.S. at 180–182, 87 S.Ct. at 2006–2007. *See also* 93 Cong.Rec. 4272, 4433 (1947), 2 Leg.Hist. 1141, 1200 (statements of Sen. Ball); 93 Cong.Rec. 4024 (1947), 2 Leg.Hist. 1030 (statement of Sen. Taft).

**54.** *See Scofield v. NLRB, supra* note 40; *NLRB v. Industrial Union of Marine Workers*, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968).

preme Court set forth a test for determining whether union action is protected by the proviso that accommodates these competing concerns. The Court stated that Section 8(b)(1)(A) leaves a union free to enforce "a properly adopted rule," provided that the rule (1) "reflects a legitimate union interest," (2) "impairs no policy Congress has imbedded in the labor laws," and (3) "is reasonably enforced against union members who are free to leave the union and escape the rule." *Id.* at 430, 89 S.Ct. at 1158.[55]

The union's conduct here does not pass this test. At the outset, there is a serious question whether the union's decision to prohibit the posting of PROD materials was made pursuant to a "properly adopted rule."[56] Certainly there was no such rule

in the union bylaws or constitution or in the collective bargaining agreement. Nor was Helton given any other form of prior notice.[57] But even assuming the union's action was pursuant to a valid rule, it fails to satisfy the three criteria set forth in *Scofield*. First, removal of Helton's PROD materials does not reflect a legitimate union interest. The union claimed that removal was necessary to prevent altercations and to limit undesirable criticism. But the NLRB has expressly held that the desire to prevent controversy or to suppress criticism of union leadership does not constitute a legitimate union interest.[58] *See Internat'l Union of Operating Engineers Local 400*, 225 NLRB 596 (1976); *Carpenters Local Union No. 22*, 195 NLRB 1 (1972).[59] In any

---

**55.** In *Scofield* the Court applied this test to hold that a union could fine and suspend union members for violating a union rule relating to production ceilings. *Scofield v. NLRB, supra* note 40, 394 U.S. at 430–436, 89 S.Ct. at 1158–1161.

**56.** The requirement that the disciplinary action be taken pursuant to a "properly adopted rule" is intended to protect union members from arbitrary or discriminatory union action. It might be argued that where the union did not act pursuant to a properly adopted rule, but where it can show that its action was justified and that it did not behave in an arbitrary or discriminatory fashion, it deserves some protection under § 8(b)(1)(A); the proviso, as well as the legislative history, indicate a strong congressional desire to minimize intrusion upon internal union affairs. Even if this argument is correct, however, the principles set forth in *Scofield* would continue to apply; the union action would have to serve a legitimate union interest, it could not impair any policy imbedded in the labor laws, and there would have to be evidence suggesting that the employee could have escaped the union's action by resigning his union membership. We explain *infra* that the union conduct at issue here does not satisfy these requirements.

**57.** On the other hand, even if the union did not have a formal rule against such postings when it decided to remove Helton's literature, its policy regarding such materials is now clear. Although it does not appear that a rule has been formally adopted, employees are on notice that if they post anti-union literature on the union bulletin board, it will be removed. Thus challenges to any future union action pursuant to this policy would probably be able to cross the initial hurdle erected by *Scofield*. *See* note 56 *supra*.

**58.** The union clearly has some interest in maintaining a unified front; that interest does not extend to suppression of all criticism, however.

**59.** In *Internat'l Union of Operating Engineers Local 400*, 225 NLRB 596 (1972), the NLRB held that a union rule prohibiting its members from holding unofficial meetings was invalid. After describing the *Scofield* test, it stated:

It can hardly be maintained with any degree of persuasion that a rule prohibiting members from meeting to attempt to generate support for a redirection in their representation's negotiating strategy is one which either reflects a legitimate union interest or * * * impairs no policy Congress has embedded in the labor laws.

*Id.* at 601. In *Carpenters Local Union No. 22*, 195 NLRB 1 (1972), the Board held that a union could not fine a member who had challenged a union election.

Here the Union, in the guise of enforcing internal discipline, has sought to deprive its members of the right, as guaranteed by the Labor-Management Reporting and Disclosure Act, to participate fully and freely in the internal affairs of his own union. A fine for that purpose not only in our opinion fails to reflect a legitimate union interest but rather in fact impairs a policy that Congress has imbedded in the labor laws. * * *

*Id.* at 2.

As the language quoted from *Carpenters* and *Operating Engineers* suggests, the questions whether a rule reflects a legitimate union interest and whether it overrides a policy imbedded in the labor laws are closely related. In both *Carpenters* and *Operating Engineers* the Board based its conclusion that the union rule did not reflect a legitimate union interest in part on the ground that it would interfere with rights ex-

event, the ALJ found that the union's fear that "such literature could lead to altercations between parties" was "mere conjecture and without any evident[i]ary support."[60]

Second, the union's conduct impairs policies imbedded in the labor laws. It restrained expression protected not only under Section 7 of the National Labor Relations Act,[61] but also under Title I of the Labor-Management Reporting and Disclosure Act (LMRDA), the "Bill of Rights" for union members.[62] Section 101(a)(2) of that statute, 29 U.S.C. § 411(a)(2) (1976), provides that "[e]very member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments or opinions[.]"[63] Congress intended this free speech right to parallel the rights conferred

under the First Amendment; it hoped to secure union democracy by establishing a right to express dissenting views without fear of discipline. The LMRDA was in part "designed to protect the rights of union members to discuss freely and criticize the management of their unions and the conduct of their officers." *Salzhandler v. Caputo*, 316 F.2d 445, 448–449 (2d Cir.), *cert. denied*, 375 U.S. 996, 84 S.Ct. 344, 11 L.Ed.2d 275 (1963).[64]

The importance of protecting the free speech rights of union members has been consistently recognized by courts asked to consider the scope of Section 101(a)(2) of the LMRDA. *See, e. g., Grand Lodge of Internat'l Ass'n of Machinists v. King*, 335 F.2d 340, 344 (9th Cir.), *cert. denied*, 379 U.S. 920, 85 S.Ct. 274, 13 L.Ed.2d 334 (1964).[65] Indeed, the right of free speech

---

tended under the Labor-Management Reporting and Disclosure Act. *Carpenters Local Union No. 22, supra*, 195 NLRB at 2; *Internat'l Union of Operating Engineers Local 400, supra*, 225 NLRB at 601–602. *See also* text and notes at notes 61–67 *infra*.

**60.** ALJ Decision at App. 6.

**61.** *See Roadway Express, Inc., supra* note 19, 239 NLRB 653; *Transcon Lines, supra* note 19, 235 NLRB 1163; *cf. Nu-Car Carriers, Inc., supra* note 31, 88 NLRB at 76 (employees may question the wisdom of their representatives or attempt to "align their union with their position").

**62.** Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. § 411 (1976). As the Board has observed, determining whether a union rule satisfies the second prong of the *Scofield* test requires consideration of the full panoply of congressional labor policies. *See Carpenters Local Union No. 22, supra* note 59, 195 NLRB at 2; *see also Scofield v. NLRB, supra* note 40, 394 U.S. at 430, 89 S.Ct. at 1158. Thus not only the National Labor Relations Act, but also all other federal labor statutes, must be considered. *Carpenters Local Union No. 22, supra* note 59, 195 NLRB at 2 n.5.

**63.** 29 U.S.C. § 411(a)(2) (1976). That section provides in full:

Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of

the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided*, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

**64.** *See also Salzhandler v. Caputo*, 316 F.2d 445, 451 (2d Cir.), *cert. denied*, 375 U.S. 996, 84 S.Ct. 344, 11 L.Ed.2d 275 (1963) ("Congress has decided that it is in the public interest that unions be democratically governed and toward that end that discussion should be free and untrammeled"); *Navarro v. Gannon*, 385 F.2d 512, 518 (2d Cir. 1967), *cert. denied*, 390 U.S. 989, 88 S.Ct. 1184, 19 L.Ed.2d 1294 (1968); *Schuchardt v. Millwrights & Machinery Erectors Local Union No. 2834*, 380 F.2d 795, 797 (10th Cir. 1967); *Amalg. Clothing Wkrs of America, Rank & File Committee v. Amalg. Clothing Wkrs of America, Philadelphia Joint Board*, 334 F.Supp. 760, 762 (E.D.Pa.1971), *aff'd*, 473 F.2d 1303 (3d Cir. 1973).

**65.** *See also Fulton Lodge No. 2 of Internat'l Ass'n of Machinists & Aerospace Wkrs v. Nix*, 415 F.2d 212, 217 (5th Cir. 1969) (right of free speech enjoys "particularly favored position"); *Salzhandler v. Caputo, supra* note 64, 316 F.2d at 448–451; *Deacon v. Internat'l Union of Operating Engineers, Local No. 12*, 273 F.Supp. 169 (C.D.Cal.1967); *Graham v. Soloner*, 220 F.Supp. 711 (E.D.Pa.1963). *See generally* 105

has been described as "almost absolute." *Turner v. Air Transport Lodge 1894 of Internat'l Ass'n of Machinists*, 590 F.2d 409, 410 (2d Cir. 1978).[66] Thus it is clear that the union conduct at issue here, by interfering with Helton's efforts to challenge the Teamsters' leadership, deprived him of rights guaranteed by the LMRDA. If the union's conduct were endorsed, an important policy of the federal labor laws would be undermined.[67]

As for the third prong of the *Scofield* test, it seems unlikely that Helton could have avoided the union's action by resigning his membership. Presumably, the union would have removed Helton's materials from the bulletin board even if he had not been a union member. Under the circumstances, it is difficult to view the union's activity simply as an effort to police its membership.[68]

## IV. AVAILABILITY OF ALTERNATIVE MEANS OF COMMUNICATION

■ As further support for its decision in this case the NLRB notes that "Helton had ready access to other, equally effective, means of distributi[ng]" PROD material.[69] It suggests that Helton could have posted the material on the sick fund board, or simply left stacks of literature in the breakroom. This argument lacks merit.

In the first place, it is not clear that Helton actually did have access to equally effective alternatives. He was not permitted to use the locked company board. Items posted on the sick fund board, which is no longer available, might not have had the same impact as items posted on the union board. Leaving stacks of literature in the breakroom would have been an inadequate substitute because company custodians would have removed the literature whenever they cleaned up.[70] Moreover, there is no assurance that the union itself would not have removed such material. In any event, this approach would have been relatively expensive.

More important, the existence of alternatives is irrelevant. It is well established that the availability of other channels of communication does not justify employer restraint of employees' Section 7 rights in nonwork areas at nonwork times. In

Cong.Rec. 6718 (1959) (remarks of Sen. McClellan).

Moreover, § 101(a)(2) protects dissemination of written materials as well as speech. *See Internat'l Brhd of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers & Helpers v. Rafferty*, 348 F.2d 307 (9th Cir. 1965); *Farowitz v. Associated Musicians of Greater New York, Local 802*, 330 F.2d 999 (2d Cir. 1964); *Salzhandler v. Caputo, supra* note 64; *Morrissey v. Nat'l Maritime Union*, 397 F.Supp. 659 (S.D. N.Y.1975); *Pearl v. Tarantola*, 361 F.Supp. 288 (S.D.N.Y.1973).

66. As we have seen, the rights of union members under the LMRDA are analogous to the free speech rights secured by the First Amendment. It is therefore relevant to note that the First Amendment decisions strongly disapprove of any form of content regulation. *See Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972) ("above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content"); *Cohen v. California*, 403 U.S. 15, 24, 91 S.Ct. 1780, 1787–1788, 29 L.Ed.2d 284 (1971); *Street v.*

*New York*, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969); *New York Times Co. v. Sullivan*, 376 U.S. 254, 269–270, 84 S.Ct. 710, 720–721, 11 L.Ed.2d 686 (1964).

67. Indeed, even though the LMRDA does not explicitly grant enforcement powers to the NLRB, the NLRB has held that union conduct infringing upon LMRDA rights constitutes an unfair labor practice under § 8(b)(1)(A). *See Internat'l Union of Operating Engineers Local 400, supra* note 59; *Carpenters Local Union No. 22, supra* note 59. These decisions provide an independent basis for our conclusion that the union's conduct in this case violates § 8(b)(1)(A). Again, it is clear that the union's conduct deprived Helton of rights secured under the LMRDA.

68. Even if this surmise is incorrect, our conclusion remains the same. The union's conduct clearly fails to pass the other two requirements of the *Scofield* test.

69. NLRB Decision, 248 NLRB at 83, App. 13.

70. Testimony of Helton, *reprinted at* App. 45.

*NLRB v. Magnavox Co.*, 415 U.S. 322, 94 S.Ct. 1099, 39 L.Ed.2d 358 (1974), the Supreme Court stated that unless the employer could show that productivity or discipline required restraint of Section 7 rights, it would not be appropriate to "balance the availability of alternative channels of communication against a legitimate employer business justification for barring or limiting in-plant communications." *Id.* at 326–327, 94 S.Ct. at 1102–1103. *See also Eastex, Inc. v. NLRB*, 437 U.S. 556, 570–576, 98 S.Ct. 2505, 2514–2517, 57 L.Ed.2d 428 (1978); *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 113, 76 S.Ct. 679, 685, 100 L.Ed. 975 (1956); *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945).[71] We see no reason why a different rule should apply here, where union conduct is at issue.[72] The simple fact that the union has attempted to restrain an employee in the exercise of his Section 7 rights is enough to justify a finding of a Section 8(b)(1)(A) violation.[73]

### V. CONCLUSION

We conclude that the union committed an unfair labor practice. The union's conduct constituted restraint of Helton's Section 7 rights within the meaning of Section 8(b)(1)(A). It was not insulated by the internal union affairs proviso since it did not serve a legitimate union interest and would have frustrated the free speech rights guaranteed by the LMRDA. Even if alternative means of communication were available, their availability was irrelevant. We grant Helton's petition for review. The NLRB will submit a proposed decree in accordance with this opinion.

*So ordered.*

---

**71.** The NLRB has consistently ruled that the presence of alternative methods of communication is not relevant in determining the rights of employees. *See H & F Binch Co.*, 168 NLRB 929, 935 (1967); *Armco Steel Corp.*, 148 NLRB 1179, 1185 (1964), *enforcement denied*, 344 F.2d 621 (6th Cir. 1965). Most circuit courts also embrace this view. *See United Steelworkers of America v. NLRB*, 393 F.2d 661 (D.C.Cir.1968); *NLRB v. United Aircraft Corp.*, 324 F.2d 128 (2d Cir. 1963), *cert. denied*, 376 U.S. 951, 84 S.Ct. 969, 11 L.Ed.2d 971 (1964); *Time-O-Matic, Inc. v. NLRB*, 264 F.2d 96 (7th Cir. 1959).

**72.** The NLRB argues that the availability of alternatives is relevant where union conduct is involved because it demonstrates that the union "has not engaged in collusion with the Company to alter employee communication rights incident to the employment relationship." Respondent's brief at 13 n.4. In other words, it has not engaged in economic coercion by relying on the economic power implicit in the employer-employee relationship. But we have already rejected the NLRB's contention that simple restraint is not enough to violate § 8(b)(1)(A), and that the union must engage in economic coercion or threaten violence. In any event, we find the NLRB's claim that union conduct closing all channels of communication constitutes economic coercion to be unconvincing. *See* note 47 *supra*.

**73.** In addition to his claim that the union committed an unfair labor practice, Helton contends that it breached its duty of fair representation. First, he suggests that any arbitrary union action violates the duty. Second, he argues that the union was not entitled to agree to contract terms that restricted postings on its bulletin board to official union business. We need not reach these arguments here. *See also* note 21 *supra* (noting that we neither approve nor disapprove the ALJ's statement that union action would have been justified if it had enforced contract provision limiting use of bulletin board to union matters).